E. H., *et al.*

*v.*

KHAN MATIN, M.D., *etc., et al.*

(No. 15278)

Decided November 10, 1981.

*E. Gail Falk, Glen D. Moffett and Daniel F. Hedges,* for petitioners.

*Chauncey H. Browning,* Attorney General, *and Curtis G. Power,* Assistant Attorney General, for respondents.

NEELY, JUSTICE:

Once again this Court's attention must be focused on the "Dickensian Squalor of unconscionable magnitudes" of West Virginia's mental institutions. *State ex rel. Hawks v. Lazaro,* 157 W.Va. 417, 202 S.E.2d 109, 120 (1974). The four petitioners, who bring this consolidated mandamus action pursuant to this Court's original jurisdiction, allege that they are confined as mental patients in Huntington State Hospital under conditions which violate *W. Va. Code,* 27-5-9 [1977] which accords all patients a right to both humane conditions of custody and therapeutic treatment.[1]

---

[1] *W. Va. Code,* 27-5-9 [1977] in its entirety, is as follows:
Rights of patients.

(a) No person shall be deprived of any civil right solely by reason of his receipt of services for mental illness, mental retardation or addiction, nor shall the receipt of such services modify or vary any civil right of such person, including, but not limited to civil service status and appointment, the right to register for and to vote at elections, the right to acquire and to dispose of property, the right to execute instruments or rights relating to the granting, forfeiture or denial of a license, permit, privilege or benefit pursuant to any law, but a person who has been adjudged incompetent pursuant to article eleven [§ 27-11-1 et seq.] of this chapter and who has not been restored to legal competency may be deprived of such rights. Involuntary commitment pursuant to this article shall not of itself relieve the patient of legal capacity.

(b) Each patient of a mental health facility receiving services therefrom shall receive care and treatment that is suited to his

Petitioners seek an order from this Court requiring the respondent clinical director of the Huntington State Hospital and respondent director of the West Virginia Department of Health to provide them with the services to which they are entitled under *Code,* 27-5-9 [1977]. The case was

needs and administered in a skillful, safe and humane manner with full respect for his dignity and personal integrity.

(c) Every patient shall have the following rights regardless of adjudication of incompetency:

(1) Treatment by trained personnel;

(2) Careful and periodic psychiatric reevaluation no less frequently than once every three months;

(3) Periodic physical examination by a physician no less frequently than once every six months; and

(4) Treatment based on appropriate examination and diagnosis by a staff member operating within the scope of his professional license.

(d) The chief medical officer shall cause to be developed within the clinical record of each patient a written treatment plan based on initial medical and psychiatric examination not later than seven days after he is admitted for treatment. The treatment plan shall be updated periodically, consistent with reevaluation of the patient. Failure to accord the patient the requisite periodic examinations or treatment plan and reevaluations shall entitle the patient to release.

(e) A clinical record shall be maintained at a mental health facility for each patient treated by the facility. The record shall contain information on all matters relating to the admission, legal status, care and treatment of the patient and shall include all pertinent documents relating to the patient. Specifically, the record shall contain results of periodic examinations, individualized treatment programs, evaluations and reevaluations, orders for treatment, orders for application for mechanical restraint and accident reports, all signed by the personnel involved.

A patient's clinical record shall be confidential and shall not be released by the department of health or its facilities or employees to any person or agency outside of the department except as follows:

(1) Pursuant to an order of a court of record.

(2) To the attorney of a patient, whether or not in connection with pending judicial proceedings.

(3) With the written consent of the patient or of someone authorized to act on the patient's behalf and of the director to:

(i) Physicians and providers of health, social or welfare services involved in caring for or rehabilitating the patient, such information to be kept confidential and used solely for the benefit of the patient.

submitted to this Court upon a record developed through depositions of the staff of Huntington State Hospital and depositions from expert witnesses who evaluated the clinical and custodial program at the hospital.

# I.

## THE PETITIONERS

E. H. is a 42-year-old Huntington resident who has been in and out of Huntington State Hospital on numerous occasions in recent years. She is diagnosed as suffering from manic depression illness (circular type) and alcohol addiction. When in a disturbed state she exhibits aggressive, destructive and delusional behavior. Between her disturbed periods, she is lucid and interacts appropriately in conversation. She was involuntarily committed to Huntington State Hospital most recently in March 1981. Before the present law suit was filed, no treatment plan had been devised for her, although she had been placed in locked seclusion on twelve separate occasions.

Petitioner L. S. is a 25-year-old woman who exhibits a high level of intelligence and skill in personal interaction. She was involuntarily committed to Huntington State Hospital in April 1981, in a highly disturbed state characterized by sexual promiscuity, severely diminished mental functioning, and poor memory combined with uncommunicative behavior. At the time of her commitment, it was not

---

(ii) Agencies requiring information necessary to make payments to or on behalf of the patient pursuant to contract or in accordance with law. Only such information shall be released to third-party payers as is required to certify that covered services have been provided.

(iii) Other persons who have obtained such consent.

No patient record, or part thereof, obtained by any agency or individual shall be released in whole or in part to any other individual or agency, unless authorized by the written consent of the patient or his legal representative.

(f) Every patient, upon his admission to a hospital and at any other reasonable time, shall be given a copy of the rights afforded by this section.

(g) The board of health shall promulgate rules and regulations to protect the personal rights of patients not inconsistent with this section.

known whether her problems were caused by mental illness or drug addiction. Nevertheless, at the time this action was filed, she had yet to receive a psychiatric evaluation. As a result of inadequate staff coordination and the absence of a proper evaluation, there are a variety of conflicting reports in her records: the respondent clinical director diagnoses her as having an "atypical psychosis"; a staff member writes, "Even during the times of aggressive behavior, the patient has always been friendly"; the staff psychologist concludes, "Since she has not improved significantly in the month she has been here, probably her schizophrenia is chronic."

Petitioner S. W. is a 39-year-old Beckley resident. She has a long history of mental illness (diagnosed as schizophrenia) and alcoholism, but before her current hospitalization she maintained herself in a community setting with only occasional hospitalization. She was committed in March 1981 and has been kept in Ward 2 where few trained staff are available to treat her.

Petitioner M. R. is a 25-year-old, severely retarded woman of small stature, who can walk with an unsteady or shuffling gait at best. She lives in Ward 11 with 30 to 40 women who are all older than she and who all suffer from a combination of severe mental and physical handicaps. Ms. R. is unable to talk although she screams on occasion. She is unable to dress herself, feed herself with utensils, or care for her own toileting needs although she is considered potentially capable of learning those skills with appropriate training. Before being moved to Huntington State Hospital, she had been trained to feed herself by the staff at Lakin Hospital. She has since lost that skill. She also exhibits aggressive and self-abusive behavior, and has a history of repeatedly burning herself on the ward heater.

## II

## THE FACILITIES

Ward 2, where petitioner W. stays, is entered through a series of double-locked doors. A visitor is immediately

impressed by the bleak and squalid atmosphere of the ward. Its green walls are utterly bare and cheerless. There are always between 30 and 40 psychiatric patients in Ward 2, many of whom mill about aimlessly throughout the day. The staff usually remain in the nursing station; their only contact with the patients occurs when they deliver medication through a two-piece door, the top part of which can be opened independently. The ward has a distinctive odor caused by patient incontinence.

Ward 11, where Ms. R. is now a resident, is similar to Ward 2 in terms of bleakness. The nurses' station is behind iron bars and is centrally located in the circular ward. Again the ambulatory patients mill about and there are occasional outbursts from the patients.

The two other petitioners were staying in what is called the pre-discharge unit. It has two floors with small rooms where group meetings can take place. Each patient has an independent, unlocked room with a footlocker. There are curtains on the windows and the atmosphere is more like that of an old house than that of a hospital. Consequently, the custodial facilities for these patients appear to meet minimal humane standards relating to the custodial setting, although we are uninformed about the relationship between the custodial setting and a program of appropriate therapy.

## III

## STAFF COORDINATION

One of the great problems at Huntington State Hospital is that when a treatment plan is drafted for a patient (which is all too seldom), it is often drafted during a meeting at which no one who has worked with the patient is present. Worse, there is often no one present with psychiatric training. One of the physicians at the hospital has no advanced training in psychiatry, nor do many of the attending nurses. Obviously when treatment plans are drafted by untrained people with no personal knowledge of the patients, they seldom meet the needs of the patients.

Even when a good plan is drafted it is seldom implemented consistently or at all by the three different shifts of staff who work with the patient each day. An example of this problem is best shown in the response to M. R.'s. screaming. The psychiatric aide in charge of Ward 11 during the day shift thinks that petitioner R.'s. screaming is an attempt by the patient to communicate; therefore, the aide responds with positive reinforcement. However, the staff members on other shifts generally think that the screaming is symptomatic of a psychiatric problem and respond with control techniques. This failure of treatment at such a basic level is symptomatic of an overall dearth of professional administration of the health services at the hospital.

Another critical problem with staff coordination is that no individual staff member is assigned the responsibility for follow-up work to assure compliance with the treatment plans. When certain therapy is recommended, there is never a listing of those responsible for conducting the therapy, when it will be conducted, and who is responsible for reviewing the patient's progress. When E. H. was moved from a ward to the pre-discharge unit, the staff of the pre-discharge unit drew up a treatment plan for her without reviewing either her old treatment plan or her other records at the hospital. As a result, her new treatment plan had no mention of the fact that she had alcohol problems. The irony of this omission concerning a woman who has virtually a lifelong chronic alcohol addiction is staggering and points out the sad problems encountered when there is no coordination and no detailed responsibility for treatment, follow-up, or supervision.

In a psychiatric ward a patient interacts with many staff members during the course of each day. It is critical that all of the staff members be instructed concerning the patients' problems and needs in order that each staff member will know what is expected of him. In the case of L. S. a doctor diagnosed her as having an "atypical psychosis." This evaluation was made without the benefit of an in-depth examination. Worse, this diagnosis is extremely rare, and few of the lesser trained staff would

have any idea what it means either in terms of her actual problem or in terms of proper treatment. Unfortunately, her record is devoid of any explanation of the diagnosis, which leaves the staff in utter ignorance about a proper response.

Lack of adequate documentation is the most easily observed shortcoming at the Huntington State Hospital. Documentation fulfills a critical function in psychiatric treatment. Clinical records are the basis for planning and continuity of patient care. They provide a means of communication among all the mental health professionals who are involved in the patient's program. These documents list continuing treatments and the observations about the patient's response to treatments as they are being applied. The records also serve as the basis for review of progress and as a basis for periodic evaluation of the individual patient care given by a facility. Finally, such records serve to assist in protecting the legal rights of both the therapist and the client. While this shortcoming is easily recognizable, its negative impact on the well-being of the patients can only be imagined.

## IV

### STAFF TRAINING AND QUALIFICATIONS

While we have focused on the tragic impact of the hospital's Kafkaesque lack of coordination and while we think that treatment would be improved immeasurably through administrative changes alone, we must also recognize the problems created by under-qualified staff. One such problem is illustrated by another example from petitioner R's. case. On her treatment plan under "psychiatric problems" is listed the fact that she tries to pull her tongue out of her mouth with her hands. This behavior is actually symptomatic of patients who have been on tranquilizing drugs for a long time. The doctors who administered the drugs to her admitted that the drugs were simply a management technique. However, there had been no recognition before the institution of this law suit that her tongue pulling was caused not by any psychiatric

problems but rather by her medication. When alerted by the petitioners' expert that this was a fairly common reaction to the drugs, one of the doctors seemed genuinely surprised.

The problems created by staff who are under-qualified can also be seen in Ms. H's. case. She is a member of a group at the pre-discharge unit which meets regularly with a bachelor's level psychologist and a psychiatric aide. At these meetings some patients are permitted to talk about their past and some are not. The psychiatric aide was unable to articulate how the distinction is made among patients in terms of who is permitted to talk and how those distinctions relate to the patients' problems or treatment plans. In another instance of amateurish care given the patients, we find that one of the psychiatric problems listed on Ms. H's. treatment plan is "stubbornness." Such a term is not generally used in a psychiatric diagnosis of behavior.. Even more sorrowful is the fact that while the staff identified one of Ms. H's. problems as fire-setting, there was no documentation of any treatment either suggested or given to address that problem.

While it is clear that the hospital is lacking in qualified staff, the addition of more qualified staff would be of little consequence without significant changes in the total administration and philosophy of care at the hospital. With improved coordination there is no doubt that, even with the hospital's limited resources, the quality of the treatment can be improved markedly. Guessing at the real staffing needs of this facility before it undergoes a major revamping in operational procedures would be speculative at best.

## V

## THE REMEDY

The record before us conclusively proves that the petitioners in this case have received woefully inadequate treatment and that the conditions of their hospitalization are such as to shock the conscience of any civilized society solicitous of the welfare of its unfortunate and disadvantaged members.

This case is somewhat extraordinary in the developing body of mental health law because the petition was brought in mandamus and not in habeas corpus; accordingly, petitioners do not seek discharge as an alternative to humane care, but rather demand from this Court an order requiring the State to provide the petitioners with the type of care to which the State has already accorded them an absolute right.

This action may be brought in mandamus because the position of the State of West Virginia is remarkably superior to the position of other states in which similar issues regarding mental health commitment have been raised. By the passage of *W. Va. Code*, 27-5-9 in 1977, the West Virginia Legislature acknowledged its concern for both humane conditions of custody and effective therapeutic treatment. Therefore, West Virginia has already articulated a legislative position which is in conformity with the highest possible standards of moral rectitude. Consequently, we are not asked to impose a new constitutional standard upon a reluctant and unwilling state; rather, we are asked only to order the executive branch to fulfill its obligation under clear and unambiguous statutory provisions.

Petitioners do no assert any private cause of action for damages; rather they ask only that the Court require the respondent administrators to comply with *W. Va. Code*, 27-5-9 [1977]. Hence, an action in mandamus is appropriate. *See State ex rel. County Court of Wood County v. State Road Commissioner*, 147 W.Va. 623, 129 S.E.2d 726 (1963). When the Legislature enacts a law giving a group of individuals a clear and explicit right, there is also created an implicit corresponding duty on the part of the State to grant or enforce that right. This observation is supported by both precedent and logic. In *State ex rel. Williams v. Board of Trustees of Policemen's Pension or Relief Fund*, 147 W.Va. 795, 131 S.E.2d 612 (1963), this Court held that where a statute entitled a retired policeman to a pension, there was a corresponding duty on the part of the fund's board of trustees to grant the pension. We then awarded a writ of mandamus to enforce the rights of the former

policeman. Today we hold that *W. Va. Code*, 27-5-9 [1977] creates a duty on the part of the State to enforce the petitioner's rights under the statute. Following *Williams*, we find that this duty is enforceable in an action in mandamus. To hold otherwise would be to imply that the Legislature passed this statute merely to serve as a hortatory expression of its wishes. We are loath to draw such a conclusion.

While the factual record before us indicates that the care and treatment provided by Huntington State Hospital is woefully below the standards established by the West Virginia Legislature in *W. Va. Code*, 27-5-9 [1977], we do not have sufficient information to enter an appropriate order enumerating the necessary changes. In cases of this type it is important for courts to recognize that we are not experts in medicine, mental health, or institutional management. Furthermore, among the best trained professionals in the field of mental health there is an enormous divergence of opinion concerning appropriate management of related institutions and appropriate techniques of therapy for different categories of patients.

The one thing which is obvious to the Court, however, is that the Huntington State Hospital cannot be taken out of the context of the entire mental health program in West Virginia. Without taking a synoptic view of the problem, opportunities for increased efficiency as well as dramatic economies may be missed. There are, for example, opportunities to segregate different types of patients in specific state hospitals which would permit specialization by each hospital in the treatment of a particular type of patient.

The Court would be remiss in its duties if it were to cast a blind eye on the fact that the four individual petitioners in this case appear here not only as individuals but as symbols of a pervasive, systemic inadequacy of our mental health hospitals the entire length and breadth of West Virginia. While this is not a class action, nonetheless, in formulating our relief we must recognize that the systemic violation of rights in the case before us presents a problem which does not admit to case by case resolution

because of the multiplicity of litigants, expense of litigation, and the abject poverty of the patient population.

This Court is not a suitable forum for the development of an appropriate plan for the entire reorganization of the mental health care delivery system in West Virginia. As a multi-member appellate court we are not equipped to hold hearings and take testimony; nor does the press of business in this, the State's only appellate Court, permit our giving this case the type of protracted and undivided attention which it requires. Consequently, under our inherent powers, we are transferring this case to the Circuit Court of Kanawha County for further proceedings to develop an appropriate remedy consistent with the guidelines set forth in this opinion.

## VI

## THE GUIDELINES

Elsewhere court intervention into the management of state mental health facilities has been predicated upon a constitutional right to treatment as a *quid pro quo* of an involuntary deprivation of liberty. Certainly these cases elsewhere instruct our understanding of the perimeters of the problem before us; however, we are not called upon at this time to decide whether the Fourteenth Amendment to the *Constitution of the United States* or *West Virginia Constitution*, art. III, § 10 impose a constitutional duty upon the State to provide adequate treatment independent of our own statutory enactment. This case exclusively concerns the rights of patients to mandamus relief under our statute. Thus we arrive at the following holdings: (1) *W. Va. Code*, 27-5-9 [1977] creates specific enforceable rights in the entire inmate population of the State's mental hospitals. (2) *W. Va. Code*, 27-5-9 [1977] requires a system of custody and treatment which will reflect the competent application of current, available scientific knowledge. Where there is a good faith difference of opinion among equally competent professional experts concerning appropriate methods of treatment and custody, such differences should be resolved by the director of the

West Virginia Department of Health and not by the courts. (3) It is the obligation of the State to provide the resources necessary to accord inmates of mental institutions the rights which the State has granted them under *W. Va. Code,* 27-5-9 [1977].[2]

In the case before us we are fortunate that we are not required to impose a new duty upon the State Legislature through constitutional interpretation. By enacting *W. Va. Code,* 27-5-9 [1977], the Legislature has already recognized its responsibility to the inmate population of the mental hospitals, and accordingly, it can be reasonably inferred that the Legislature will cooperate with the West Virgina Department of Health and the Circuit Court of Kanawha County in implementing an appropriate plan to accord inmates their statutory rights.

---

[2] Elsewhere a question has arisen concerning the financial implications of the enforcement of the legal rights of mental patients. The question has usually been phrased in terms of separation of powers since orders according mental patients decent treatment imply a reallocation of State budgets, which may deprive the Legislature of its right to establish priorities for State funds. The definitive answer to this objection to Court intrusion into the area of mental health has been provided by the case of *Wyatt v. Aderholt,* 503 F.2d 1305, 1314-15, (5th Cir.1974) where the court said:

It goes without saying that state legislatures are ordinarily free to choose among various social services competing for legislative attention and state funds. But that does not mean that a state legislature is free, for budgetary or any other reasons, to provide a social service in a manner which will result in the denial of individuals' constitutional rights. And it is the essence of our holding that the provision of treatment to those the state has involuntarily confined in mental hospitals is necessary to make the state's actions in confining and continuing to confine those individuals constitutional. That being the case, the state may not fail to provide treatment for budgetary reasons alone. . . ."

While we do not reach the issue of whether involuntary commitment creates a constitutional right to treatment, we do note that a growing number of courts have followed *Aderhold* and recognized such a right. *See. e.g., Romeo v. Youngberg,* 644 F.2d 147 (3d Cir. 1980), *cert. granted,* ___ U.S. ___, 101 S.Ct. 2313, 68 L.Ed.2d 838 (1981); *Welsch v. Likins,* 550 F.2d 1122 (8th Cir. 1977); *Flakes v. Percy,* 522 F. Supp. 1325 (W.D. Wis. 1981); *Eckerhart v. Hensley,* 475 F. Supp. 908 (W.D. Mo. 1979).

We note that the presence of *W. Va. Code,* 27-5-9 [1977] guaranteeing appropriate treatment for all patients distinguishes this case from *Pennhurst State School Hospital v. Halderman,* ____ U.S. ____, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). In *Pennhurst,* the Court refused to interpret the Developmentally Disabled Assistance and Bill of Rights Act of 1975, 42 U.S.C. § 6001 *et seq.,* as creating affirmative obligations on the part of the states accepting federal funds to provide a specified quality of treatment. The difference between the case before us and *Pennhurst* is readily apparent. In *Pennhurst* the Supreme Court held that Congress did not intend to establish enforceable rights in the inmate population of State hospitals when it listed standards for care in what was otherwise an appropriations act. The West Virginia statute under consideration, *Code,* 27-5-9 (1977), however, is included in the *Code* chapter and article dealing with mental health treatment and could not have been passed for any reason other than to establish rights in mental patients. Since *Code,* 27-5-9 (1977) speaks to "rights," there is obviously a corresponding duty on the part of someone, here the State. Without an opportunity for inmates to seek mandamus in the courts, both right and duty evaporate in any meaningful sense and the entire *Code* provision becomes either a joke or an exercise in irony. We cannot infer that either was the intent of our Legislature.

## VII

### PROCEEDINGS BEFORE THE CIRCUIT COURT

It is ordered that this case be docketed in the Circuit Court of Kanawha County as if it were an original proceeding in mandamus in that court. It is further ordered that within ninety days from the service of this Court's order upon the respondents that they submit a plan to the Circuit Court of Kanawha County through which the rights established by *Code,* 27-5-9 [1977] will be accorded to every patient in mental health institutions maintained by the State of West Virginia. During the oral arguments of this case here counsel for both the petitioners and the

respondents indicated to the Court that they could cooperate in the preparation of such a plan and that many issues potentially in dispute between the patients and the care providers could be worked out in advance of any further proceedings in the lower court. Certainly, given the complexity of the problems presented by this case, the Court requests and requires of counsel for both sides the utmost good faith cooperation consistent with their obligations to their clients.

After submission of the plan to the Circuit Court of Kanawha County petitioners shall have an additional thirty days to file their objections to the plan along with any alternative plan which they might urge. Thereafter, on a priority basis, the Circuit Court of Kanawha County shall hold further hearings to resolve the issues in dispute between petitioners and respondents. The circuit court shall be responsible for approving the plan and for handling all further proceedings necessary to insure implementation of that plan by the appropriate officials.

The Circuit Court of Kanawha County should explore whether the current system of providing a variety of services at each mental health facility is an appropriate way of maximizing overall efficiency in the total health care delivery system, or whether each hospital should specialize in a particular type of patient.

The patient profiles of M. R., the 25-year-old severely retarded woman, and L. S., the young woman of superior intellectual endowment and friendly personality, point out the enormous diversity of patients which our system of mental health is expected to handle. A threshold question for any court called upon to act as umpire in the preparation of the new plan for the care and treatment of the mentally ill must be the level of resources to be expended on the curable and incurable respectively. The distinction between curable and incurable is not necessarily congruent with the distinction between the mentally ill and the mentally retarded. Within the categories of "mentally ill" and "mentally retarded" are individuals who will respond to training and/or treatment and individuals who

will not so respond. Consequently, a skillful system of classifying patients ultimately leading to their assignment to the appropriate program is a consideration of the first order. Yet the classification of patients as incurable by untrained or indifferent staff is a haunting spector.

Nonetheless, it appears to the Court that it is possible that patients who cannot be cured with today's existing scientific knowledge may be best served by emphasizing humane and pleasant custodial settings where money which would otherwise be spent on useless treatment can be spent on soft drinks, candy bars, television sets, individual privacy, cheerful decorations, etc. Furthermore, the mixing of the curable with the incurable can have a deleterious effect on both groups. The incurable do not receive the benefit of an emphasis on humane custodial care and the curable suffer from the inevitable deterioration of staff and patient morale which constant exposure to hopeless situations necessarily entails. It would appear to the Court that inquiry into appropriate divisions of patients may further Code 27-5-9(b) [1977] since it will certainly enhance the administration of care suitable to the individual needs of each patient as well as the dignity and personal integrity of each individual group. Yet, if upon transfer to the circuit court it should appear that such classifications are impracticable or dangerous because of a high likelihood of unskilled diagnosis, the circuit court, after fully addressing the issue and upon the basis of a fully developed record, may choose another means of achieving the goals of Code, 27-5-9(b) [1977].

The record before us indicates that the staff members of our mental hospitals are woefully untrained. By calling attention to their lack of training we in no way disparage the dedicated and unappreciated efforts of personnel who have undertaken one of the most difficult and thankless jobs which this society has to offer. Yet it is not possible to run a modern mental health facility which will achieve acceptable therapeutic results without medical doctors who possess advanced training in psychiatry and who speak English with the facility of a native speaker. Also,

no modern mental health hospital can operate without clinical psychologists with graduate level educations and nurses with advanced training in psychiatric nursing. It is not sufficient to hire marginally trained doctors without competitive American credentials and put them in charge of patients with whom they cannot communicate on anything but the most basic level.[3] Accordingly the plan submitted to the Circuit Court of Kanawha County must include the exact figures of appropriate patient to staff ratios setting forth the credentials and training required for each staff position and the appropriate ratios of highly trained staff with doctorate level credentials to less well-trained staff with masters degrees or nursing degrees, and the ratios of all trained staff to untrained custodial staff.

Finally, the record before us demonstrates that the State attempted to make these issues moot by providing the named petitioners extraordinary care during the pendency of this law suit. Since petitioners are already receiving much of the relief for which they prayed it is ordered that such treatment continue pending the final resolution of the other issues presented by this case. Since the violation of petitioners' rights in this case is capable of repetition, the release of any or all of the petitioners from hospitalization shall not be deemed to moot this case for adjudicative purposes. *See Hawks v. Lazaro, supra.*

For the reasons set forth above, the case is transferred to the Circuit Court of Kanawha County for further proceedings consistent with this opinion with directions to

---

[3] While this Court disclaims any expertise in the field of medicine as it relates to the mentally ill or mentally retarded, nonetheless, during the course of any given year, we are exposed to scores of criminal and other records which reflect the interaction between patients and staff at our public mental health facilities. "[W]e cannot shut our eyes to matters of public notoriety and general cognizance. When we take our seats on the bench we are not struck with blindness, and forbidden to know as judges what we see as men. . . ." *Ho Ah Kow v. Nunan*, 12 F. Cas. No. 6,546, 252, 255 (C.C.D. Cal. 1879) (Field, J.).

the court to enter such orders and exercise such powers as if the case had originally been brought there as an original mandamus.

*Transferred to the Circuit Court of Kanawha County with instructions.*