674 S.E.2d 240

**STATE of West Virginia, ex rel. Khan MATIN, M.D., Petitioner,**

v.

**The Honorable Louis BLOOM, Judge of the Circuit Court of Kanawha County, and E.H. et al., Respondents.**

No. 34582.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 27, 2009.

Decided Feb. 6, 2009.

See also, 168 W.Va. 248, 284 S.E.2d 232, 189 W.Va. 102, 428 S.E.2d 523, 189 W.Va. 445, 432 S.E.2d 207.

Darrell V. McGraw, Attorney General, Charlene A. Vaughan, Deputy Attorney General, Charleston, for the Petitioner.

Jennifer S. Wagner, Esq., Daniel F. Hedges, Esq., Mountain State Justice, Inc., Charleston, for the Respondents.

PER CURIAM [1].

This case is before the Court upon a Petition for a Writ of Prohibition filed by the West Virginia Department of Health and Human Resources ("DHHR") in which it seeks to prohibit the Circuit Court of Kanawha County from taking any action in the underlying mandamus action. The DHHR objects to the re-opening of *E.H. v. Matin,* Civil Action No. 81–MISC–585, for the purposes of (1) conducting an evidentiary hearing on the progress in implementing care to individuals with traumatic brain injuries and (2) examining the issue of overcrowding and other potential violations of *W.Va.Code,* 27–5–9 [2007] [2] at State psychiatric facilities.

---

1. Pursuant to an administrative order entered on January 1, 2009, the Honorable Thomas E. McHugh, Senior Status Justice, was assigned to sit as a member of the Supreme Court of Appeals of West Virginia commencing September 12, 2008, and continuing until the Chief Justice determines that assistance is no longer necessary, in light of the illness of Justice Joseph P. Albright.

2. *W.Va.Code,* 27–5–9 [2007] in its entirety, is as follows:

(a) No person may be deprived of any civil right solely by reason of his or her receipt of services for mental illness, mental retardation or addiction, nor does the receipt of the services modify or vary any civil right of the person, including, but not limited to, civil service status and appointment, the right to register for and to vote at elections, the right to acquire and to dispose of property, the right to execute instruments or rights relating to the granting, forfeiture or denial of a license, permit, privilege or benefit pursuant to any law, but a person who has been adjudged incompetent pursuant to article eleven of this chapter and who has not been restored to legal competency may be deprived of such rights. Involuntary commitment pursuant to this article does not of itself relieve the patient of legal capacity.

(b) Each patient of a mental health facility receiving services from the facility shall receive care and treatment that is suited to his or her needs and administered in a skillful, safe and humane manner with full respect for his or her dignity and personal integrity.

(c) Every patient has the following rights regardless of adjudication of incompetency:

(1) Treatment by trained personnel;

As set forth below, we find that the circuit court's proposed order-to conduct an evidentiary hearing in this matter—falls within the circuit court's power to ensure that a state agency complies with legislative mandates. Specifically, the circuit court has the power to ensure that patients are receiving treatment guaranteed to them under *W.Va.Code,* 27–5–9. The circuit court also has the power to enforce a Consent Order it previously issued. For these reasons, the Petitioner's Writ of Prohibition is denied.

## I.

### *Facts and Background*

This mandamus action was originally filed in this Court on June 23, 1981, by a group of patients at the Huntington State Hospital, which has since been renamed the Mildred H. Bateman Hospital ("the hospital"). In *E.H. v. Matin,* 168 W.Va. 248, 284 S.E.2d 232 (1981) (*"Matin I"*), Justice Neely provided a vivid description of the hospital, stating "Once again this Court's attention must be focused on the 'Dickensian Squalor of unconscionable magnitudes' of West Virginia's mental institutions." 168 W.Va. at 249, 284 S.E.2d at 232. This 'Dickensian Squalor' included problems with the facilities[3], poor communication among the staff and treating physicians, and numerous administrative problems including staff training and qualification issues.

To formulate a remedy to address these problems, the Court stated that the Legislature had already articulated guidelines for the operation of the State's mental health facilities:

> By the passage of *W.Va.Code,* 27–5–9 in 1977, the West Virginia Legislature acknowledged its concern for both humane conditions of custody and effective therapeutic treatment. Therefore, West Virginia has already articulated a legislative position which is in conformity with the highest possible standards of moral rectitude. Consequently, we are not asked to impose a new constitutional standard upon a reluctant and unwilling state; rather, we are asked only to order the executive branch to fulfill its obligation under clear and unambiguous statutory provisions.

168 W.Va. at 257, 284 S.E.2d at 237.

The Court went on to state that it was not an expert in medicine, mental health or institutional management, nor was it a suitable forum for the development of an appropriate plan for the entire reorganization of the mental health care delivery system in the state.

(2) Careful and periodic psychiatric reevaluation no less frequently than once every three months;

(3) Periodic physical examination by a physician no less frequently than once every six months; and

(4) treatment based on appropriate examination and diagnosis by a staff member operating within the scope of his or her professional license.

(d) The chief medical officer shall cause to be developed within the clinical record of each patient a written treatment plan based on initial medical and psychiatric examination not later than seven days after he or she is admitted for treatment. The treatment plan shall be updated periodically, consistent with reevaluation of the patient. Failure to accord the patient the requisite periodic examinations or treatment plan and reevaluations entitles the patient to release.

(e) A clinical record shall be maintained at a mental health facility for each patient treated by the facility. The record shall contain information on all matters relating to the admission, legal status, care and treatment of the patient and shall include all pertinent documents relating to the patient. Specifically, the record shall contain results of periodic examinations, individualized treatment programs, evaluations and reevaluations, orders for treatment, orders for application for mechanical restraint and accident reports, all signed by the personnel involved.

(f) Every patient, upon his or her admission to a hospital and at any other reasonable time, shall be given a copy of the rights afforded by this section.

(g) The Secretary of the Department of Health and Human Resources shall propose rules for legislative approval in accordance with the provisions of article three, chapter twenty-nine-a of this code to protect the personal rights of patients not inconsistent with this section.

3. A representative portion of Justice Neely's description reads: "A visitor is immediately impressed by the bleak and squalid atmosphere of the ward. Its green walls are utterly bare and cheerless. There are always between 30 and 40 psychiatric patients in Ward 2, many of whom mill about aimlessly throughout the day." 168 W.Va. at 252–53, 284 S.E.2d at 234.

168 W.Va. at 259, 284 S.E.2d at 237–38. The Court therefore transferred the matter to the Circuit Court of Kanawha County to monitor the case consistent with guidelines announced in the opinion. These guidelines provide us with a means of assessing the current action before this Court. The *Matin I* guidelines state:

This case exclusively concerns the rights of patients to mandamus relief under our statute. Thus we arrive at the following holdings: (1) *W.Va.Code*, 27–5–9 [1977] creates specific enforceable rights in the entire inmate population of the State's mental hospitals. (2) *W.Va.Code*, 27–5–9 [1977] requires a system of custody and treatment which will reflect the competent application of current, available scientific knowledge. Where there is a good faith difference of opinion among equally competent professional experts concerning appropriate methods of treatment and custody, such differences should be resolved by the director of the West Virginia Department of Health and not by the courts. (3) It is the obligation of the state to provide the resources necessary to accord inmates of mental institutions the rights which the State has granted them under *W.Va.Code*, 27–5–9 [1977].

168 W.Va. at 259–60, 284 S.E.2d at 238.

After a number of hearings in the circuit court, the parties agreed and the circuit court accepted, in October 1983, what is termed the West Virginia Behavioral Health System Plan. *E.H. v. Matin*, 189 W.Va. 102, 104, 428 S.E.2d 523, 525 (1993) ("*Matin II*"). This plan was to be implemented by the DHHR with oversight by the court and a court monitor. The plan was implemented and no significant problems with it were brought before this Court until 1993. In 1993, in *Matin II* the DHHR appealed a ruling by the circuit court halting the construction of a new hospital.[4]

The Court in *Matin II* found that the circuit court exceeded its authority in ordering the halting of construction on the new hospital. Specifically, Syllabus Point 1 of *Matin II* held:

Where the legislature, through the budget process, expressly provides for funding to build a new public facility, absent some constitutional challenge or an express statutory provision to the contrary, the courts are not authorized to interfere with the legislative mandate.

The Court in *Matin II* was concerned about the level of the circuit court's involvement in the decisions of the DHHR relating to the Behavioral Health System Plan. The Court ordered the parties to file briefs on whether continued monitoring by the circuit court was appropriate.

Four months later, in *E.H. v. Matin*, 189 W.Va. 445, 432 S.E.2d 207 (1993) ("*Matin III*"), the Court held that the reasons for continued circuit court monitoring outweighed the reasons in support of discontinuing it. The Court therefore decided to keep the court monitor in place for eighteen more months, unless a sufficient showing could be made to continue it for a longer period of time.

The circuit court monitoring continued until 2002. In an order dated March 27, 2002, the circuit court dissolved the office of the court monitor and removed the case from its active docket. The circuit court stated that it would only consider major non-implementation issues going forward, including the eight unresolved issues[5] that were identified in the order. The circuit court's order also

---

4. The reasons advanced for preventing the construction of this hospital were that the State should not spend money on a new hospital facility because there were community mental health facilities that could be utilized. Also, it was claimed that Medicaid funds which could be obtained through community mental health facilities could not be obtained at the new hospital. Finally, it was argued that it would be cheaper to build several regional facilities than to build the larger new hospital. *See Matin II*, 189 W.Va. at 104, 428 S.E.2d at 525.

5. The eight unresolved issues identified were: (1) community placement of certain residents of Hopemont, Pinecrest and Lakin hospitals, (2) adequate reimbursement for residential board and care, personal care and adult family care settings. (3) case management services, (4) crisis services, (5) funding for uncompensated care, (6) Green Acres Regional Center, (7) forensic services, and (8) traumatic brain injury services.

notes that it would only consider these issues after submission to an "ombudsman" process. While the case was removed from the circuit court's active docket, the court continued to hold periodic hearings on the progress the parties were making on these unresolved issues.

In 2002, the position of "Ombudsman for Behavioral Health" was developed at the request of the then-Secretary of the DHHR, Paul Nussbaum.[6] It was hoped that the Ombudsman could provide an internal and informal means of resolving compliance issues without resorting to litigation. Ideally, the Ombudsman would attempt to resolve individual patient complaints by facilitating communication between agencies and through the use of mediation. The Ombudsman compiles regular reports of grievances, monitors compliance with various court orders issued in *E.H. v. Matin*, and is to meet regularly with DHHR officials to resolve and avoid litigation.

The Ombudsman has issued regular reports to the circuit court and the DHHR from 2003 through 2008. The current dispute arises, first, out of two issues raised by the Ombudsman in his 2007–2008 Annual Report[7]. These issues involve (1) generally, the provision and coordination of case management services; and (2) specifically, the treatment of traumatic brain injuries. The traumatic brain injury issue was initially resolved on July 3, 2007, when the parties entered into a "Consent Order on Services To Individuals With Traumatic Brain Injuries." This Consent Order was entered into between the parties, with the assistance of a mediator. The circuit court did not participate in the making of the Consent Order, but adopted it after both parties agreed to it. The circuit court held a hearing on May 15, 2008, regarding the implementation of the traumatic brain injury delivery plan, as set forth in the Consent Order, and found that the DHHR had made insufficient progress and noted the possibility of reopening the matter for an evidentiary hearing.

Second, the current dispute arises out of another Ombudsman's report that was issued on July 3, 2008, titled "A Review of Over–Bedding at Mildred Mitchell–Bateman Hospital and Recommended Order." This report, which builds upon the Ombudsman's earlier report regarding the provision and coordination of case management services, was the result of a number of grievances filed in April, May and June of 2008. As suggested by its title, this report details a severe overcrowding problem at the hospital. This problem has resulted in patients having diminished or virtually no privacy; patients not having access to private bathrooms; patients not having access to shower facilities on a daily basis; male patients not being able to shave on a daily basis; and patients sustaining injuries from tripping over cots when there are three patients to one room. Another problem the hospital staff reported to the Ombudsman was the mixing of patient populations, especially the nursing home patients with dementia patients.[8]

The report also details other staff related issues including a practice called "Freezing", in which staff members are required to work an additional eight hour shift on top of the eight hour shift they have just finished. This "Freezing" process is mandatory and those that refuse to follow the practice are given written reprimands. The staff also stated that the "90 day temp" employee system does not work. These 90 day temporary workers are often, if not always, unqualified and inexperienced staff assigned to deal with violent and aggressive patients. One of these 90 day temporary employees was fired

---

**6.** David G. Sudbeck was hired to fill the Ombudsman position.

**7.** The Ombudsman's 2007–2008 Annual Report identifies three remaining unresolved issues from the original eight identified by the circuit court in its March 27, 2002 Order. These three issues are (1) case management services, (2) forensic services and (3) traumatic brain injury services. The circuit court's proposed evidentiary hearing did not seek to examine the forensic services

issue and neither party has raised it at the present time.

**8.** Justice Neely noted this same problem in *Matin I* stating: "There are, for example, opportunities to segregate different types of patients in specific state hospitals which would permit specialization by each hospital in the treatment of a particular type of patient." 168 W.Va. at 258, 284 S.E.2d at 237.

for drinking on the job and the regular staff generally does not feel comfortable working with them.

In general, the portrait that emerges from the Ombudsman's reports is that of a hospital that is overcrowded with patients, most of whom are frustrated by living on top of each other, being denied privacy and not having daily access to basic grooming needs. The regular staff suffers from extremely low morale due to forced overtime and working with unqualified temporary workers with questionable backgrounds. Specifically, the term 'Dickensian Squalor' that Justice Neely used to describe the hospital in 1981 is an apt description of the hospital that emerges from the Ombudsman's July 3, 2008 report.

The DHHR chose not to accept the Ombudsman's recommendations contained at the end of his reports. In an August 27, 2008, letter from the Deputy Attorney General, Charlene A. Vaughan, to the Ombudsman, she stated:

The DHHR remains grateful to you for your work in helping identify the problems Bateman is experiencing in managing the unusually high number of patients committed to it and underscoring the urgency with which these problems need to be addressed; however, (the DHHR) does not accept your Recommended Order.

On August 28, 2008, the circuit court held a hearing on the issues identified in the Ombudsman's Reports and on the continuing question of the DHHR's compliance with the traumatic brain injury Consent Order agreed to by the parties in July 2007. The circuit court found that the Ombudsman's reports raised significant issues of non-compliance with the Consent Order and possible violations of *W.Va.Code*, 27-5-9, such that it determined that an evidentiary hearing on these matters was warranted. The circuit court's order states:

After hearing on the issues related to progress in the implementation of the Traumatic Brain Injury Services Delivery Plan, and review of the progress by DHHR in the development thereof, the Court finds that there has been insufficient progress toward resolution of the issue. In additional [sic] after hearing on the issue of overcrowding at the State psychiatric facilities and the complexities contained within, the Court finds that the consistent overcrowding ("overbedding") is not disputed and there is no remedy in sight; and thereupon,

It is hereby ORDERED that the proceedings in the above-styled action be reopened in this matter for the purpose of evidentiary hearings and relief upon these two issues.

On September 19, 2008, the DHHR filed the instant Petition seeking a writ of prohibition to halt enforcement of the circuit court's August 28, 2008 order.

## II.

### *Standard of Review*

■ Our standard of review for a petition for a writ of prohibition is set forth in Syllabus Point 4 of *State ex. rel. Hoover v. Berger*, 199 W.Va. 12, 483 S.E.2d 12 (1996):

In determining whether to entertain and issue the writ of prohibition for cases not involving the absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

*In accord,* Syllabus Point 1, *State ex. rel. Tucker Co. Solid Waste Authority v. W.Va. Div. of Labor,* 222 W.Va. 588, 668 S.E.2d 217 (2008).

## III.

### *Discussion*

■ The DHHR raises three grounds on which it argues the circuit court's proposed order re-opening this case for an evidentiary hearing is clearly erroneous as a matter of law. It should be noted at the outset that the DHHR is not arguing that the circuit court does not have jurisdiction to be involved in this matter generally. Rather, the DHHR's argument is that the proposed evidentiary hearing the circuit court seeks to conduct would exceed the circuit court's jurisdiction previously granted to it by this Court in the three prior *Matin* decisions and would encroach on both the Legislative and Executive branches authority.

The first argument by the DHHR is that the circuit court is exceeding its authority previously granted to it by the Supreme Court in the three *Matin* decisions. The DHHR argues that it has worked with the court monitor/Ombudsman for twenty-five years and has met all of the challenges that have arisen during this time period. The DHHR states that the conditions that led the Court in *Matin I* to order court supervision of the hospital were far worse than the conditions that are present today. Citing to *Board of Education of Oklahoma City Public Schools v. Dowell,* 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991), the DHHR argues that termination of court oversight in an institutional reform case is appropriate when the local authority can establish that (1) it has complied in good faith with the decree, (2) its compliance has lasted for a reasonable period of time, and (3) the vestiges of past violations have been eliminated to the extent practicable. 498 U.S. at 248–51, 111 S.Ct. 630.

While the Respondents attempt to factually distinguish *Dowell* from the present case, the DHHR's argument is unconvincing even under the *Dowell* test. The DHHR's attempt to differentiate the past violations described in *Matin I* from the current conditions is simply not persuasive. The underlying issue in this case from the beginning was whether the DHHR was in compliance with *W.Va.Code,* 27–5–9, which creates specific enforceable rights for the entire inmate population of the State's mental hospitals. This Court's and the circuit court's involvement in this case, the court monitors and the current Office of the Ombudsman have all been attempts to ensure patients in the State's mental institutions are being afforded the protections guaranteed to them in *W.Va.Code,* 27–5–9. After reading the Ombudsman's July 3, 2008 report on the conditions at the hospital, the circuit court believed that there were potentially a number of violations of *W.Va. Code,* 27–5–9 occurring at the hospital, and scheduled an evidentiary hearing to develop a record on these issues.

Despite the DHHR's argument to the contrary, many of the same issues that were present in 1981 at the time of the *Matin I* decision continue to be problems today, according to the Ombudsman's report. These issues include the mixing of patient populations, and the numerous staffing issues described above. With this in mind, even if this Court were to accept the *Dowell* standard, the DHHR has not shown that it can meet the third prong of the test, that is, that vestiges of past violations have ceased.

The DHHR next argues that the proposed circuit court order unconstitutionally encroaches on executive branch authority. The DHHR argues that it has evaluated the need for hospitalization and other behavioral health services, and has identified funding available to provide those services. The DHHR relies on *Matin II* to support its argument here, but ultimately fails to demonstrate how the circuit court's proposed evidentiary hearing encroaches on the executive branch. *Matin II* held that the circuit court exceeded its authority in ordering the halting of construction of a new hospital. The circuit court in this case is not ordering any project to be halted or trying to control some function that is normally reserved for the executive or legislative branch. Rather, the proposed evidentiary hearing has come about for the same reason that a court monitor was put

in place at the beginning of this case in 1981, because of the possible violations of *W.Va. Code*, 27–5–9. The DHHR has not demonstrated how the circuit court's Order is encroaching on executive branch authority.

Finally, and in a similar vein to the second point, the DHHR argues that the circuit court is encroaching on legislative branch authority. Specifically, it is arguing that the legislative branch, not the judicial branch, of government controls the DHHR's budget, and the circuit court cannot order the DHHR to operate in a manner which would cause it to exceed its current budget. The DHHR again argues that the issues currently active in this case are separate and distinct from those that were present during *Matin I*, and that this Court should therefore not follow *Matin I*. However, the Court in *Matin I* anticipated that their decision would raise a separation of powers question. As the Court explained in a footnote, ensuring compliance with a statute passed by the legislature, is not an invasion of legislative authority:

Elsewhere a question has arisen concerning the financial implications of the enforcement of the legal rights of mental patients. The question has usually been phrased in terms of separation of powers since orders according mental patients decent treatment imply a reallocation of State budget, which may deprive the Legislature of its right to establish priorities for State funds. The definitive answer to this objection to Court intrusion into the area of mental health has been provided by the case of *Wyatt v. Aderholt*, 503 F.2d 1305, 1314–15 (5th Cir.1974) where the court said:

It goes without saying that state legislatures are ordinarily free to choose among various social services competing for legislative attention and state funds. But that does not mean that a state legislature is free, for budgetary or any other reasons, to provide a social service in a manner which will result in the denial of individuals' constitutional rights. And it is the essence of our holding that the provision of treatment to those the state has involuntarily confined in mental hospitals is necessary to make the state's actions in confining and continuing to confine those individuals constitutional. That being the case, the state may not fail to provide treatment for budgetary reasons alone . . ."

168 W.Va. at 260 n. 2, 284 S.E.2d at 238 n. 2.

With this background in mind, the Court in *Matin I* stated:

In the case before us we are fortunate that we are not required to impose a new duty upon the State Legislature through constitutional interpretation. By enacting *W.Va. Code*, 27–5–9 [1977], the Legislature has already recognized its responsibility to the inmate population of the mental hospitals, and accordingly, it can be reasonably inferred that the Legislature will cooperate with the West Virginia [sic] Department of Health and the Circuit Court of Kanawha County in implementing an appropriate plan to accord inmates their statutory rights.

168 W.Va. at 260, 284 S.E.2d at 238.

This reasoning applies to the present case. The circuit court is within its authority to conduct an evidentiary hearing to determine whether violations of *W.Va.Code*, 27–5–9 are occurring. The DHHR has failed to demonstrate how a proposed evidentiary hearing encroaches on legislative branch authority.

■ Finally, we must address the circuit court's decision to review the traumatic brain injury services issue. Both parties entered into a "Consent Order on Services To Individuals With Traumatic Brain Injuries" on July 3, 2007. The Department has allegedly failed to comply with the time line that it agreed to in the Consent Order. As we once said in Syllabus Point 1 of *Seal v. Gwinn*, 119 W.Va. 19, 191 S.E. 860 (1937);

A court may, under its inherent powers, reinstate a cause which has been dismissed by consent of parties, and enter such orders and decrees as may be necessary to enforce the decrees entered before dismissal.

Accordingly, we believe that the circuit court is well within its authority to hold an evidentiary hearing on the DHHR's failure to comply with this Consent Order.

## IV.

*Conclusion*

The DHHR's petition for a writ of prohibition is denied.

Writ Denied.